**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FRED MCCLEARY,** | : | **Civil No.  4:25-CV-26** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **FRANK BISIGNANO,**[1] | : | |
| **Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

Social Security appeals lie at the intersection of law and medicine. While the disability determination is ultimately a question of law, that legal issue is often necessarily shaped by medical opinions. Informed decision-making in this field therefore requires that legal and medical decisionmakers share a common and commonly understood lexicon.

---

[1] Frank Bisignano became the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

What then happens when judges, lawyers and medical personnel ascribe different meanings to terms which may determine the outcome of disability decisions? Oftentimes the result is confusion which defeats reasoned analysis.

So it is here.

The plaintiff, Fred McCleary applied for disability citing a cascading array of severe mental impairments, conditions which McCleary stated left him with a paralyzing inability to follow the simplest of instructions. McCleary's treating caregiver agreed, stating that he was totally disabled by these emotional impairments.

However, the Administrative Law Judge (ALJ) who decided this case disagreed with this assessment and denied McCleary's claim. In doing so, the ALJ endeavored to navigate an array of ambiguous and internally inconsistent medical opinions from non-treating sources. First, the ALJ considered two opinions by state agency experts which used a legal term of art in a casual and casually incoherent way. These state agency experts indicated that McCleary's mental impairments only mildly impaired his ability to follow simple instructions but then paradoxically stated that McCleary could understand one-to-two-step tasks. These were curious opinions because the experts' references to one-to-two-step tasks involved a term of art in Social Security practice which connotes jobs limited to reasoning level 1 since

2

the definition of this reasoning level is confined to jobs which entail: "Apply[ing] commonsense understanding to carry out simple one- or two-step instructions." Dictionary of Occupational Titles, Appendix C - Components of the Definition Trailer, 1991 WL 688702. Thus, the state agency experts' opinions that McCleary could perform one- and two-step tasks were tantamount to a finding that he was limited to reasoning level 1 jobs, and was inconsistent with the experts' conclusions that McCleary was only mildly impaired in terms of following simple instructions.

This initial confusion stemming from the medical experts' casual use of a term which has legal significance was then compounded by the ALJ who suggested that these medical opinions were not fully persuasive because they did not adequately consider the severity of McCleary's limitations in following simple instructions. After finding that this aspect of the state agency experts' opinions was unpersuasive because they understated the degree of his impairment, the ALJ declared that the opinion of a consulting examining source had greater persuasive power. But this consultant's opinion found that McCleary had no difficulty following simple instructions, a finding which, under the ALJ's stated rationale, should have rendered the consultant opinion even less persuasive than the state agency experts.

The ALJ then declared that McCleary was moderately impaired in terms of understanding and applying information, a conclusion which was inconsistent with

3

all of the medical opinions the ALJ found persuasive. Finally, the ALJ arrived at a mental residual functional capacity assessment for McCleary  which was seemingly unmoored to any medical opinion and concluded that he had the mental capacity to maintain concentration, persistence, or pace for two-hour segments sufficient to perform routine two-to-three-step tasks or instructions.

McCleary now appeals this decision challenging the ALJ's mental RFC analysis. In our view, the ALJ's internally inconsistent analysis rests upon three legal infirm foundations: First, it fails to recognize a casual conflation of concepts by state agency experts. Second, it  rejects evidence for no reason or for the wrong reason. Finally, this medical opinion analysis does not provide the essential logical nexus between medicine and law that is necessary for informed decision-making. Therefore, we will order this case remanded for further consideration by the Commissioner.

## II.    <u>Statement of Facts and of the Case</u>

### A. <u>Introduction</u>

On April 18, 2022, Fred McCleary applied for disability and disability insurance benefits along supplemental security income pursuant to Titles II and XVI of the Social Security Act, alleging an onset of disability beginning February 24, 2021. (Tr. 10). In these applications McCleary alleged that he was disabled due to an array of physical and mental impairments, including degenerative disc disease of the lumbar spine and cervical spine, osteoarthritis of the knees, mild tricompartmental marginal spurring of the right ankle, obesity, depression, anxiety, post-traumatic stress disorder, bipolar disorder, substance use disorder (marijuana use), obsessive compulsive disorder, attention deficit hyperactivity disorder, intermittent explosive disorder, and personality disorder. (Tr. 13).

McCleary on was born on February 26, 1975 and was forty-five years old at the time of the alleged onset of his disability, making him a younger worker under the Commissioner's regulations. (Tr. 27). His formal education ended in the eighth grade, although he later obtained a GED online reportedly with extensive assistance from his paramour. (Tr. 54). He had prior employment as a fast food cook. (Tr. 27).

### B. McCleary's Mental Impairments and the Expert Opinions Regarding Those Limitations.

5

For his part, McCleary has consistently described the severity of his emotional impairments in terms which were disabling. As the ALJ observed:

> As to the claimant's mental impairments, the claimant has alleged experiencing symptoms of difficulty falling asleep, crying spells, hopelessness, a loss of usual interests, irritability, fatigue, a loss of energy, diminished self-esteem, difficulty concentrating, a diminished sense of pleasure, social withdrawal, excessive apprehension and worry, being easily fatigued, a fear of being judged or negatively evaluated in social settings, avoidance of social settings, phobic responses around crowds and in close space, a hyper startle response, nightmares, hypervigilance, avoidance, intrusive thoughts, anger outbursts, detachment from others, panic attacks, auditory and visual hallucinations, paranoia, racing thoughts, restlessness, repetitive behaviors, anhedonia, suicidal ideation, guilt, worthlessness, and short-term memory deficits. The claimant has also used marijuana (Exhibits B7F, B8F, and B16F). Additionally, the claimant's medical records indicate the claimant has been assessed with clinical examination findings of an impaired memory, impaired concentration, a constricted and anxious affect, anxious mood, nervous behavior, and anxious, constricted, and irritable affect, a concrete thought content, variable attention, fair insight, and fair judgment (Exhibits B8F and B16F).

(Tr. 21).

In particular, at his hearing before the ALJ, McCleary described a level of anxiety and panic attacks which were so frequent and so severe that they left him effectively paralyzed in terms of even simple decision making. (Tr. 59-62).

The clinical record, while extensive, was more complex and in some respects contradictory. The longitudinal medical record of McCleary's mental impairments revealed a lengthy treatment history. In some instances, the clinical findings were

relatively unremarkable; on other occasions they were grave. However, this treatment history contained entries documenting anxiety, depression, visual and auditory hallucinations, some paranoid thought processes, and instances of suicidal ideation.

Thus, a psychiatric evaluation conducted by the Pennsylvania Psychiatric Institute on April 15, 2021, noted that McCleary reported childhood abuse, paranoid thinking, anxiety, depression and hallucinations. (Tr. 544-546). He also had a family history of violence and self-harm. McCleary's mother had reportedly attempted suicide; his father was incarcerated for murder. (Id.)

Subsequent nursing notes of periodic medication maintenance encounters at the Pennsylvania Psychiatric Institute between 2021 and 2023 were generally unremarkable,[2] however, these notes also indicated that McCleary continued to experience hallucinations, hypervigilance and paranoia. (Tr. 917). His progress in treatment was described as minimal in many areas. (Tr. 913-15). The most benign aspects of these notes, in turn, were contradicted by the reports of McCleary's counselor at the Pennsylvania Psychiatric Institute, Francis Montresor, LSW, who twice stated that McCleary experienced marked impairments in multiple spheres of

---

[2] Tr. 554-55, 558-59, 561, 562-63, 567, 571, 580, 904-05, 909.

workplace conduct, would often be off task, and would frequently miss work. (Tr. 1013-19, 1023-26).

Other caregivers provided a mixed picture concerning McCleary's mental state. Wellspan Internal Medicine treatment records of the plaintiff's treatment in 2022 and 2023, consistently reported that McCleary suffered from hallucinations and weekly panic attacks, (Tr. 797, 809, 823, 829-30), while indicating that he was oriented in terms of times, people and places. (Tr. 801, 806, 813, 827, 834, 842). In April of 2022, these records indicated that McCleary was unable to hold a job and was permanently disabled because of his generalized anxiety disorder. (Tr. 614).

The severity of these symptoms were also documented on August 1, 2022 by a consultative examiner, Dr. John Kajic, who described McCleary's emotional state in the following terms:

> He reports difficulty falling asleep with frequent awakening and 1 appetite to be normal. Depressive symptomatology: Crying spells, hopelessness, loss of usual interests, irritability, fatigue and loss of energy, diminished self-esteem, concentration difficulties, diminished sense of pleasure, and social withdrawal. Suicidal and homicidal ideation, plans, intents, or means were denied at this time. Anxiety-related symptomatology: Excessive apprehension and worry, easily fatigued, irritability, fear of being judged or negatively evaluated in social settings, avoidance of social settings, and difficulty concentrating. Phobic responses: Around crowds and in close spaces. Trauma experiences: Physically and/or sexually abused as a child, had guns pulled on, had knives pulled on him, has been robbed, has been mugged, has been in car accidents- Exposure to trauma: Flashbacks,

hyperstartle response, nightmares, hypervigilance, avoidance, intrusive thoughts, anger outbursts, detachment from others, and sleep disturbances. The claimant reports he has had at least 10 significant panic attacks leading to medical intervention. Triggers: Unknown. He gets palpitations, nausea, sweating, dizziness, breathing difficulties, trembling, and chest pain. Manic symptomatology: Denied. Thought disorders: When asked about auditory or visual hallucinations, he said, "sometimes I sees shadow figures out of the corner of my L eye and when I'm trying to fall asleep when it is very silent I start to hear music when no music is playing" He said this has been going on for about five or six years. He says he feels like people are following him watching him, or out to get him based on his past experiences. Other symptoms of obsessions and compulsions: He reports when he is anxious he uses medical marijuana to calm down. Cognitive symptomatology: short-term memory deficits and concentration difficulties.

(Tr. 531-532).

In May of 2023, McCleary commenced mental health treatment with Wellspan Philhaven. At that time, his clinical history and symptoms were stated that:

Fred identifies a history of Major depressive disorder, Generalized anxiety disorder, Obsessive Compulsive disorder, Attention-deficit hyperactivity disorder, Post-traumatic stress disorder, and Intermittent explosive disorder. Fred reports struggling with mental health throughout his entire life. He identifies an extensive trauma history in childhood. His father was arrested for murder and is currently incarcerated for life. His mother had difficulty providing for him and at one point they were living out of a hearse during the winter months. Fred's grandparents came and got him and he ended up being raised by them. Fred's grandfather was physically and verbally abusive. Fred grew up in York City and also experienced traumatic incidences while living there. He was shot at once as a teenager, had two guns pulled on him on another occasion, and was also witnessed someone being killed on his street. Fred began receiving mental health treatment in 2008. He

9

has had services through WS Philhaven in the past. He switched to PPI as his therapists at Philhaven kept leaving.

His current therapist is now leaving PPI and the drive is also too far for him. Fred would like to establish both outpatient therapy and medication management through WS Philhaven. Fred was first diagnosed with Bipolar disorder in 2008 by Dr. Zimberg at WellSpan Philhaven. He later received neuropsychological testing and it was determined he did not have Bipolar disorder, but rather ADHD. Fred denies any symptoms of mania. Fred reports an increase in anxiety and depression over the last two months. He has no known trigger or stressor. He reports labile moods with irritability. He is very anxious and feels depressed overall. Fred endorses symptoms of anxiety including excessive worry, nervousness, racing thoughts, restlessness, poor concentration, irritability, mind going blank, and trouble falling and staying asleep at night. He is often too anxious to go out in public and will avoid leaving the house. If he is alone in public he becomes on edge and afraid. He does believe this is part of his PTSD. He is constantly looking over his shoulder and is hypervigilant. He reports when he is anxious he has difficulty calming down and worries he will become angry. When angry he will yell, scream, and have irrational thoughts. This is mostly directed toward his girlfriend. He will break or throw items in the home every 3-4 months. Fred reports having panic attacks every few days or weeks lasting 5-10 minutes. Fred endorses symptoms of depression including loss of interest in doing things, anhedonia, feelings of worthlessness and guilt, perceived burdensomeness, decreased appetite, slow movement, trouble making decisions, and suicidal ideation. Fred reports thoughts of suicide with a method of stabbing himself. He denies having a plan or intent to act on his thoughts. Fred denies homicidal ideation, method, plan, or intent. Fred has been taking Prozac for about 3 months and Buspar for a few years. He reports these are both ineffective.

10

(Tr. 962). Subsequent treatment notes from May through September 2023 consistently documented racing and suicidal thoughts, recurrent, repetitive behaviors, and auditory hallucinations. (Tr. 926-51).

Given this complex clinical history, the medical opinion evidence was particularly significant in determining whether McCleary's multiple emotional impairments were wholly disabling. On this score, three sources opined regarding the gravity of McCleary's mental state.

First, McCleary's treating counselor, Francis Montresor, LSW, twice submitted medical questionnaires in February 2022, (Tr. 1013-19), and December 2023. (Tr. 1023-26). In these questionnaires, LSW Montresor consistently described McCleary's impairments as disabling. According to Montresor, McCleary suffered from depression, anxiety, PTSD, intermittent explosive disorder and ADHD. (Tr. 1013). These impairments markedly impaired McCleary's ability to make simple work decisions, complete a workday, work with others, and adapt to workplace changes. (Tr. 1015-16, 1024-26). LSW Montresor stated that these emotional limitations would impede McCleary's ability to stay on task and would result in excessive absenteeism at work. (Tr. 1017, 1026). His prognosis was deemed poor. (Tr. 1023).

11

In contrast, two non-treating, non-examining state agency sources reached very different conclusions based upon the same clinical record. Yet, the opinions of these state agency sources were internally inconsistent in ways that were seemingly unrecognized by either the experts or the ALJ. In an August 2022 initial assessment by Dr. Emanuel Schnepp, and a January 2023 reconsideration evaluation by Dr. Melissa Franks, these experts reached two irreconcilable determinations, finding that McCleary had mild limitations on his ability to understand and apply information, but only had the mental capacity to manage, understand, and complete simple one- or two-step tasks.   (Tr. 121, 128, 134, 140). These findings are inherently contradictory since, under the Dictionary of Occupational Titles, the ability to perform one-to-two-step tasks confines a worker to reasoning level 1 jobs, the most severe restriction on workplace reasoning. See Dictionary of Occupational Titles, Appendix C - Components of the Definition Trailer, 1991 WL 688702. Therefore, a one-to-two-step functional capacity cannot be readily reconciled with mild impairments in understanding and applying information.

One other expert, a consulting examining source, Dr. John Kajic, also opined regarding the degree of impairment experienced by McCleary, albeit in a somewhat contradictory fashion. Dr. Kajic's report documented multiple impairments on McCleary's part including phobic responses, multiple panic attacks requiring

12

medical intervention, hallucinations, memory deficits and concentration difficulties. (Tr. 531-532). Yet, while Dr. Kajic endorsed this constellation of severe symptoms, he opined that McCleary experienced no limitations on understanding simple instructions. (Tr. 535).

### C. The ALJ Hearing and Decision

It was against this medical backdrop that McCleary's disability claim came to be heard by the ALJ on December 6, 2023, at which McCleary and a Vocational Expert (VE) testified. (Tr. 49-69). McCleary's testimony described the emotionally paralyzing effect of his anxiety in terms of his decision-making ability. (Tr. 59-62). The VE, in turn, testified that McCleary could perform tasks which entailed a reasoning level of 2, but was never asked to reconcile this testimony with the state agency expert opinions which appeared to state that McCleary could only perform one-to-two-step tasks. (Tr. 64-67).

Following this hearing, on March 1, 2024, the ALJ issued a decision denying McCleary's application for benefits. (Tr. 7-29). In that decision, the ALJ first concluded that the plaintiff last met the insured status requirements of the Social Security Act on December 31, 2022, and had not engaged in substantial gainful activity since February 24, 2021, the alleged onset date. (Tr. 13). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that McCleary

had the following severe impairments: degenerative disc disease of the lumbar spine and cervical spine, osteoarthritis of the knees, mild tricompartmental marginal spurring of the right ankle, obesity, depression, anxiety, post-traumatic stress disorder, bipolar disorder, substance use disorder (marijuana use), obsessive compulsive disorder, attention deficit hyperactivity disorder, intermittent explosive disorder, and personality disorder. (Id.)

At Step 3, the ALJ determined that these impairments did not meet or medically equal the severity of any listed impairments. (Tr. 13-18). However, in reaching this conclusion, the ALJ made findings regarding the severity of McCleary's mental impairments which were ultimately at odds with the medical opinions deemed persuasive by the ALJ.  Specifically, the ALJ found that:

> In understanding, remembering or applying information, the claimant has a moderate limitation. The claimant has alleged experiencing symptoms of auditory and visual hallucinations, racing thoughts, and short-term memory deficits (Exhibits B7F and B8F). He alleges having a hard time following instructions, he cannot remember written instructions, he has trouble remembering instructions, he needs reminders for appointments, he needs help or reminders to take medication, he needs reminders to go places, and he is not able to pay bills, handle a savings account, or use a checkbook/money orders (Exhibit B5E). The claimant's medical records indicate the claimant has been assessed with clinical examination findings of an impaired memory and a concrete thought content (Exhibits B8F and B16F).

(Tr. 16).

14

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity ("RFC"), considering the plaintiff's limitations from his impairments, stating that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, scaffolds or work at unprotected heights; frequently reach front/lateral, handle, finger, feel, push, and pull bilaterally; occasionally overhead reach bilaterally; can tolerate occasional exposure to operating motor vehicles, contact with moving mechanical parts, temperature extremes, humidity, wetness, vibration, concentrated dust, fumes, or gases; *can maintain concentration, persistence, or pace for two hour segments sufficient to perform routine two to three step tasks or instructions*; can frequently interact with public, supervisors, or coworkers; can frequently perform team or tandem type work; and can perform work that involves no more than frequent changes in work situations in a routine work setting.

(Tr. 18-19) (emphasis added).

This RFC was unmoored from any of the medical opinions deemed persuasive by the ALJ; moreover, the medical opinions which the ALJ found persuasive were internally inconsistent, were inconsistent with one another, and were inconsistent with the ALJ's findings.

At the outset, the ALJ rejected the treating source opinions of LSW Montresor, which concluded that McCleary often experienced moderate to marked impairment, finding them unpersuasive. (Tr. 26). The ALJ did not reconcile the

15

rejection of this medical opinion with his own determination that McCleary was moderately impaired in mental functioning.

As for the state agency expert opinions, the ALJ, stated that:

State agency psychological consultants completed opinions on August 12, 2022 and January 13, 2023 that indicate the claimant has some moderate limitations pertaining to social interaction and sustained concentration and persistence. The State agency psychological consultants also completed psychiatric review techniques that indicate the claimant has an overall mild degree of limitation pertaining to understanding, remembering, or applying information and adapting or managing oneself and an overall moderate degree of limitation regarding interacting with others and concentrating, persistence, or maintaining pace, (Exhibits B4A, B5A, B8A, and B9A). In support of the opinions, the State agency psychological consultant provided explanatory comments that include references to symptoms pertaining to the claimant's mental impairments. Additionally, the opinions of the State agency psychological consultant are consistent with the claimant's medical records on a longitudinal basis, including clinical examination findings of normal speech, a normal thought content, a euthymic mood, an intact memory, normal motor activity, a normal thought process, an intact long-term memory, an intact immediate memory, an intact short-term memory, appropriate eye contact, a cooperative manner, intact concentration, intact insight, intact judgment, and a euthymic mood and notations in the claimant's medical records indicating the claimant denied experiencing any mental health symptoms and the claimant reported he is socializing appropriately. However, the aspects of the State agency psychological consultants' opinions pertaining to understanding, remembering, or applying information and adapting or managing oneself do not adequately consider symptoms and abnormal clinical examination findings pertaining to understanding, remembering, or applying information and adapting or managing oneself. Thus, the undersigned only finds the opinions of the State agency psychological consultants partially persuasive, specifically noting the aspects of the State agency

16

psychological consultants' opinions pertaining to understanding, remembering, or applying information and adapting or managing oneself are not persuasive.

(Tr. 24).

The ALJ's treatment of these opinions was notable in several respects. First, the ALJ made no mention of the one-to-two-step limitations contained in those opinions. Thus, the ALJ seemingly failed to recognize the inherent tension between this aspect of the experts' reports and their findings that McCleary was only mildly limited in applying information beyond acknowledging that the reports "do not adequately consider symptoms and abnormal clinical examination findings pertaining to understanding, remembering, or applying information and adapting or managing oneself." (Id.) In this regard, the ALJ plainly suggested that, in terms of following instructions, McCleary suffered from greater mental limitations than those described by the state agency experts. Yet, paradoxically, the ALJ then assigned greater persuasive power to Dr. Kajic's medical opinion which found that McCleary "has no limitations pertaining to understanding, remembering, and carrying out simple instructions." (Tr. 23). This inconsistency also remained unexplained by the ALJ.

Having made these findings, the ALJ concluded that McCleary could not return to his past work but could perform other work in the national economy, which

17

were SVP-2 occupations that exceeded the one-to-two-step task mental limitations found by the state agency experts.(Tr. 27-28). The ALJ then determined that the plaintiff did not meet the stringent standard for disability set by the Act and denied this claim. (Id.)

This appeal followed. (Doc. 1). On appeal, McCleary contends, *inter alia*, that the ALJ's mental RFC evaluation was flawed. After a review of the evidence, we agree that the ALJ's adoption of a less restrictive limitation of two-to-three-step instructions was divorced from any medical opinion, coupled with the ALJ's overall treatment of the medical opinion evidence, does not provide us an adequate factual, legal and logical bridge between the evidence and the ALJ's ultimate decision denying benefits. Therefore, we will remand this case for further consideration by the Commissioner.

## III.    Discussion

### A. Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012).

18

Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record

19

and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

20

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that

21

decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based upon alleged inadequacies in the articulation of a claimant's mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In Hess the court of appeals considered the question of whether an RFC which limited a claimant to simple tasks adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could

22

function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

## B.  Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of

23

the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §404.1545(a)(2).

24

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

25

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at

26

*5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate

27

which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C. **Legal Benchmarks for the ALJ's Assessment of Medical Opinions**

The plaintiff filed this disability application following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"),

28

2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more

29

medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. When presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). However, the ALJ must still fully articulate the basis of this medical opinion evaluation. Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). It also follows that "when a medical opinion is found persuasive and contains a limitation to one- and two-step tasks, the ALJ is obligated to either: (1) include the limitation in the RFC and limit the claimant to reasoning level one occupations, or, (2) identify the substantial evidence that the ALJ is relying on in rejecting the limitation." Cruz, 2025 WL 2813882, at *8.

These legal benchmarks guide us in the instant case.

### D. **This Case Will Be Remanded.**

After a review of the record, we conclude that the ALJ's attempt to navigate the complex clinical record and contradictory medical opinions in this case has failed. In reaching this conclusion we find ourselves at the intersection between two well-settled paradigms in the Social Security field. First, our highly deferential standard of review empowers "[t]he ALJ – not treating or examining physicians or State agency consultants – [to] make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Thus, our decision in this case in no way undercuts the legal tenet that an ALJ is not required to adopt every limitation opined by the experts but "can formulate an RFC based on different parts from the different medical opinions." Durden, 191 F.Supp.3d at 455. However, at base, an ALJ must draft a reviewable opinion that is grounded in the evidence and provides the court with an adequately articulated and well-reasoned rationale for the limitations adopted.

Here, the internal inconsistencies in the ALJ's evaluation of the medical opinion evidence and the adoption of a two-to-three-step instruction limitation in the RFC fail to meet this basic standard of articulation. Indeed, this analysis is flawed in the following significant respects.

31

First, the ALJ failed to fully reconcile the rejection of the treating source opinions—which found that McCleary suffered from moderate to marked impairments—with the ALJ's decision that the plaintiff was moderately impaired in all spheres of intellectual activity in the workplace.

Second, the ALJ failed to analyze, address or even fully acknowledge the internal inconsistencies in the state agency opinions which casually conflated mild mental impairments with an RFC that restricted McCleary to one-to-two-step tasks. This was error and is a persistent form of error which has led to multiple remands in this past.[3]

Third, the ALJ found that the state agency reports "do not adequately consider symptoms and abnormal clinical examination findings pertaining to understanding, remembering, or applying information and adapting or managing oneself," (tr. 24), plainly suggesting that, in terms of following instructions, McCleary suffered from

---

[3] See e.g., Whitney v. Bisignano, No. 4:24-CV-1950, 2026 WL 522922, at *10 (M.D. Pa. Feb. 25, 2026); Cruz v. Bisignano, No. 1:24-CV-1966, 2025 WL 2813882, at *7 (M.D. Pa. Sept. 30, 2025); Michelle M. v. Bisignano, No. 3:23-CV-02163, 2025 WL 2713737, at *7 (M.D. Pa. Sept. 23, 2025); Warren v. Dudek, No. 1:24-CV-635, 2025 WL 1168276, at *6 (M.D. Pa. Apr. 22, 2025); Shipman v. Kizakazi, No. 3:22-CV-00636, 2023 WL 5599607, at *10 (M.D. Pa. Aug. 29, 2023).

greater mental limitations than those described by the state agency experts. Yet, paradoxically, the ALJ then assigned greater persuasive power to Dr. Kajic's medical opinion which found that McCleary "has no limitations pertaining to understanding, remembering, and carrying out simple instructions." (Tr. 23). This inconsistency was unexplained by the ALJ.

Finally, the mental RFC crafted by the ALJ—which found that he can maintain concentration, persistence, or pace for two-hour segments sufficient to perform routine two-to-three-step tasks or instructions—was unmoored to any of the medical opinions found persuasive by the ALJ, and seemingly found that he could do more than the state agency experts opined, even though the ALJ concluded that those state agency experts had overstated McCleary's ability to apply information. We have in the past opined that this type of *ad hoc* mental RFC formulation  fails as a matter of law. Matos v. Bisignano, No. 4:24-CV-675, 2025 WL 2918975, at *12 (M.D. Pa. Oct. 10, 2025). So it is in this case as well.

Simply put, given these compounding contradictions more was needed here by way of explanation on the ALJ's part. Since the ALJ's burden of articulation is not met in the instant case, this matter will be remanded for further consideration by the Commissioner. Yet, while we find that these errors compel a remand in this case, nothing in this Memorandum Opinion should be deemed as expressing a judgment

33

on what the ultimate outcome of any reassessment of this evidence should be. Instead, that judgment should remain to province of the ALJ. Finally, because we have vacated and remanded the decision of the Commissioner on these grounds, we decline to address any other issues since "[a] remand may produce different results on these claims, making discussion of them moot." Burns v. Colvin, 156 F.Supp.3d 579, 598 (M.D. Pa. Jan. 13, 2016).

Finally, we close as we began, by observing that one root cause of this remand is an issue which courts have repeatedly observed, the apparent failure of legal and medical professionals to attach a common meaning to the words they use. Thus, we note for the Commissioner that the casual conflation of one-to-two-step RFCs in medical opinions with widely varying opinions regarding the claimant's degree of impairment, if unaddressed, will continue to compel remands in the future.

## IV.   Conclusion

Accordingly, for the foregoing reasons, the plaintiff's request for a new administrative hearing is GRANTED, the final decision of the Commissioner denying these claims is vacated, and this case is remanded to the Commissioner to conduct a new administrative hearing.

An appropriate order follows.

_s/ Martin C. Carlson_
Martin C. Carlson
United States Magistrate Judge

DATED: March 5, 2026